2015 IL App (1st) 130048

FIRST DIVISION
April 20, 2015

No. 1-13-0048

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 16037 |
| | ) | |
| ZACHARY BROWN, | ) | Honorable |
| | ) | Arthur F. Hill, Jr., |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant, Zachary Brown, a 16-year-old juvenile at the time of the offense, was tried as an adult pursuant to the mandatory transfer provision of the Juvenile Court Act of 1987.   705 ILCS 405/5-130(1)(a)(ii) (West 2010).   A jury convicted him of aggravated battery with a firearm and three counts of attempted first degree murder.   In one of the counts for attempted first degree murder, count IV, the jury found that he personally discharged a firearm that proximately caused great bodily harm.   720 ILCS 5/8-4(c)(1)(D) (West 2010).   The circuit court merged defendant's convictions into count IV and sentenced him to 50 years' imprisonment, which consisted of a 25-year prison term for attempted first degree murder and a 25-year sentencing enhancement for personally discharging a firearm that proximately caused great bodily harm to another.

¶ 2 Defendant raises the following issues for our review: (1) whether the State presented sufficient evidence to support the sentencing enhancement (720 ILCS 5/8-4(c)(1)(D) (West 2010)) he received based on the jury's finding that he personally discharged a firearm that caused great bodily harm; (2) whether the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2010)) is constitutionally valid; (3) alternatively, whether his sentence is excessive in light of his age, family support, education, and lack of a violent criminal background; and (4) whether his mittimus needs to be corrected.

¶ 3 We hold the State presented sufficient evidence to support the 25-year sentencing enhancement imposed on defendant's conviction for attempted first degree murder by showing that defendant caused great bodily harm. 720 ILCS 5/8-4(c)(1)(D) (West 2010). Pursuant to our supreme court's recent decision in *People v. Patterson*, 2014 IL 115102, ¶¶ 88-111, we uphold the constitutionality of the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2010)). We hold the circuit court abused its discretion in sentencing defendant to 25 years' imprisonment for attempted first degree murder where the court, in determining the sentence, relied on speculative evidence and where defendant's sentence failed to satisfy the constitutional objective of restoring defendant to useful citizenship. Accordingly, we reduce defendant's sentence for attempted first degree murder to six years' imprisonment. Therefore, defendant's sentence is 6 years' imprisonment for attempted first degree murder, with a 25-year enhancement for personally discharging a firearm that proximately caused great bodily harm to another, for a total prison term of 31 years.

¶ 4                                    JURISDICTION

¶ 5 The circuit court sentenced defendant on October 11, 2012. Defendant filed a motion to reconsider his sentence on November 2, 2012. The circuit court denied defendant's motion to

reconsider his sentence on November 28, 2012. Defendant timely filed his notice of appeal on the same day. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. Rs. 603, 606 (eff. Feb. 6, 2013).

¶ 6                                    BACKGROUND

¶ 7     Defendant was charged by indictment with one count of aggravated battery with a firearm and four counts of attempted first degree murder. The State nol-prossed one of the attempted first degree murder counts, count V. Prior to trial, defendant acknowledged that he rejected the State's offer of an eight-year prison term in exchange for a plea of guilty.

¶ 8     At trial, Pearl Colvin, a Pace bus driver, testified that on July 16, 2010, at approximately 4:47 p.m., she was boarding passengers at the 79th and Western Avenue bus terminal in Chicago. There were "at least 12" people on the bus. She noticed "one particular passenger," a young African-American male, "seemed to be nervous about something" and looked back and forth out the door while standing at the front of the bus at the luggage rack. A young African-American male with braids in his hair, wearing dark trousers and a white T-shirt, boarded the bus. Within seconds she heard four gunshots coming from behind her inside the bus and she bent down for safety. When she looked up, she did not see the male with the dark trousers and braided hair. She moved the bus to a safer location and saw that the passenger who had been standing nervously at the luggage rack at the front of the bus had been shot in the leg and was bleeding. She told authorities on the scene that she was not able to identify the shooter because she did not see his face. She confirmed that the bus had at least five cameras taking video footage of the bus which accurately depicted the events that occurred that day.

¶ 9    Ian Roy, a college student, testified that at the time of the incident he was waiting at the bus terminal and noticed defendant wearing a white T-shirt and blue jeans standing by a vending machine approximately 25 feet away with a group of young men.   Roy made eye contact with defendant.   This caused him concern because he was not from the area and the group of young men looked at him in a "crazy" manner.   Roy then boarded the bus and as he was walked toward the back of the bus he heard two gunshots.   He tried to run to the back and exit the bus. He saw defendant at the front of the bus holding a gun and wearing a mask.   He described defendant has having "dreads."   Defendant had taken his T-shirt off and used it to cover his face.   After unsuccessfully attempting to push the door open at the back of the bus he hid under a seat.   He heard two more shots, looked up, and saw defendant standing over him with a gun. Roy described what happened next as follows:

"Q. What happened then as [defendant] is standing over you?

A.   He shoots two times.   He's shooting.   He tries to run off.   When he runs off, I guess his gun jammed or something and he shot again.   I saw that because I had peeked around the side of the chair.

Q. When did you peek around the side?

A. After I felt the gunshots, he shot, pow! Pow! And then he started to run off and I peeked around so I could see if I could get away or something and he's standing at the front and his gun jammed or something.   He was playing with it.

Q. Is that when there were two more shots that went off?

A. Yes, sir.   After he fixed it or whatever."

Roy had been shot in the left ankle and his right thigh.   He did not see where defendant ran to after the shooting.   He left the bus and tried to walk away but the police sat him down and

placed him in an ambulance. Police brought defendant to the ambulance and Roy identified him as the shooter.

¶ 10    Roy was taken to the hospital by ambulance and treated for his gunshot wounds. He testified the bullet that hit his ankle "went in and came out" but that the bullet that hit his right thigh was still inside his leg at trial. When asked whether he had "any complications or discomfort or pain associated with" the bullet in his thigh he answered "Yes, sir. I feel like I lose feeling every now and then. It will go numb for no reason." Roy admitted he had a pending residential burglary case and a 2008 conviction for residential burglary. He testified that he had not been promised anything in exchange for his testimony.

¶ 11    On cross-examination, Roy testified that he tried to get off the bus to "walk off myself" but that the police sat him down on the curb. An ambulance arrived, and he walked to the ambulance without the help of the police.

¶ 12    Shaneese Bennet testified she was a passenger on the bus at the time of the incident. She saw Roy get on the bus and run. Roy sat down for about five seconds before another young man entered the bus and began shooting. She observed Roy run to the back door and try to get out. She then saw Roy fall to the floor in the fetal position. She described the shooter as an African-American male with dreadlocks. The shooter wore blue jeans but was not wearing a shirt. The shooter had a shirt covering his face from his eyes down. She thought she heard "anywhere from 6 to 8 rounds" being fired. Bennet told the police on the scene that she could not identify the shooter because she could not see his face, only has race, build, and hair.

¶ 13    Juan Arevalo testified he was on the bus with his grandson at the time of the incident. He heard a "popping noise" coming from outside the bus. He looked to the front of the bus and saw defendant shooting a firearm at a person he was chasing. He described defendant as

African-American, young, tall, well-built, with dreadlocks. He testified defendant had a shirt over his face. He later saw defendant run off the bus through the front door. Arevalo testified that a victim was in front of him "screaming in pain" on the ground. Arevalo identified defendant on the scene. He also identified photographs of defendant and Roy.

¶ 14 Chicago police officer James Haworth testified he was on patrol with his partner Officer McCullough in the area near the bus terminal at the time of the incident. He noticed defendant running in the middle of the street wearing a white T-shirt pulled up over his face, which he found to be unusual. The officers tried to cut defendant off at the next street, but defendant saw them and ran between two houses. Defendant's shirt was around his shoulders and neck but not over his body or chest. Defendant was wearing blue jeans. Eventually, defendant slowed down and started walking and the police placed him in custody. Officer Hayworth testified that defendant was exhausted and "basically gave up" and could not run any further. At that time, defendant did not have a shirt on. Defendant was taken back to the bus and Officer Haworth retraced defendant's steps to look for evidence. Officer Haworth found a pistol and a white t-shirt. The jury also heard testimony consistent with Officer Haworth's account from Officer Kelvin McCullough and Sergeant Lawrence Gade.

¶ 15 Officer John Heneghan, an evidence technician for the Chicago police department, testified that he processed the scene of the crime and the chase. He recovered a firearm, a 22-caliber Smith and Wesson semiautomatic pistol. Upon recovering the weapon, Officer Heneghan observed the gun was not functioning properly due to a condition called "stove piping." He explained:

"What happened was *** for whatever reason the gun wasn't functioning

properly, it was dirty. There [are] several reasons why this could happen. The

explosion happened, a bullet came out, but the shell that the bullet sits in didn't get out fast enough and the live round came up and the shell trapped itself in the magazine or in the ejection port of the weapon and it looks like a stove pipe like that comes out of a chimney, out of your roof because it's kind of round at the top, you know, it looks like a stove pipe. Well, that's the industry term. It's called stove piping and what that means is that the weapon won't fire unless you clear it."

The State then asked Officer Heneghan if his explanation was "[a]nother way to say that *** the gun is jammed," to which Officer Heneghan answered, "[y]es." At the bus terminal, Officer Heneghan observed a cartridge case outside the bus on the curb and "low impact blood splatter inside the bus." He described a low impact blood splatter as "[a] passive stain, a drop. There's no velocity to it. It's consistent with somebody standing in a stationary position and blood is just dripping off your finger, if you will, and you get that nice round circle."

¶ 16 Detective Timothy O'Brien testified that he investigated the shooting and spoke with six witnesses from the bus. The witnesses generally described the shooter as an African-American male with dreadlocks, skinny, with a white T-shirt over half of his face.

¶ 17 Robert Berk, a trace evidence analyst with the Illinois State Police, testified as an expert in trace evidence analysis and gunshot residue analysis. He testified that the results of the gunshot residue kit performed on defendant were negative. He explained that a negative gunshot residue kit does not necessarily mean that the person did not fire a gun.

¶ 18 Elizabeth Haley, a forensic scientist specializing in firearms identification, testified that her comparison of the shell casings fired from the gun found by the police after chasing

defendant were from the same gun used in the bus shooting. When asked if she noted anything in regard to the functionality of the weapon, she testified as follows:

"I noticed that it functioned as intended. I did make a note that the slide of the firearm did not move smoothly on a consistent basis. When I had used it to load the firearm from the magazine, it would tend to not go forward with enough force in order to close. It would stop about midway through. So, I had to hand load the firearm, so I did not use the magazine. I held the slide open, I placed an unfired cartridge in the chamber and then from there the slide moved freely and I was able to test fire it."

The State asked Haley "could that cause this weapon to jam," to which she responded, "[y]es, it could." She was later asked by the State whether the magazine fit and functioned in the weapon, to which she answered that it did fit and functioned but not consistently. She explained that "[i]t would function and then it would jam or wouldn't quite move all the way."

¶ 19    The State also entered into evidence video footage taken from the bus's security cameras which show an African-American male with dreadlocks, wearing jeans and a white T-shirt wrapped around his face enter the bus and shoot Roy.

¶ 20    After the State rested, defendant motioned the court for a directed verdict, which the circuit court denied. The defense rested without presenting any evidence. Following closing arguments, the jury found defendant guilty of aggravated battery with a firearm and three counts of attempted first degree murder. For one of those counts of attempted first degree murder, count IV, the jury found that defendant personally discharged a firearm that proximately caused great bodily harm to Ian Roy. Defendant filed a motion for a new trial, which the circuit court denied.

¶ 21   At sentencing, the circuit court noted that it had received the presentence investigation report and set forth the permissible range of sentencing.   The court explained that count IV for attempted first degree murder had a sentencing range of 6 to 30 years' imprisonment.   Due to the jury's specific finding that defendant personally discharged the firearm that caused great bodily harm; an additional mandatory sentence of 25-years-to-life needed to be added to defendant's sentence.   Neither party presented live testimony, although defendant made a statement after the parties argued their respective positions.   The State argued that due to the seriousness of the crime and the factors in aggravation, including the harm caused and threatened by defendant, a substantial sentence was necessary as a deterrent.   The State pointed out that defendant endangered not only the victim in this case, but also other people on the bus and at the bus station.   In mitigation, defense counsel noted that defendant is a juvenile being tried as an adult.   Defense counsel argued defendant was attending school prior to the incident and had a good relationship with his teachers and the support of his family.   He had completed the ninth grade and was in the process of entering the tenth grade prior to his arrest.   He played basketball through high school.   Accordingly, defense counsel urged the court to sentence defendant to a minimum of 31 years' imprisonment.   After defense counsel concluded his argument, the circuit court asked defendant if he would like to say anything.   In response, defendant stated "I would like to say today *** I'm sorry for what happened that day and if I can change anything, I would never have been in that area.   That's all."

¶ 22   The circuit court merged counts I, II, and III into count IV and sentenced defendant to 25 years' imprisonment for attempted first degree murder with an additional 25 years' imprisonment for personally discharging a firearm which caused great bodily harm.   The circuit court found defendant's actions to be a serious threat of harm to the community.   The court acknowledged

that defendant is not in a gang, has a good relationship with his family, and went to a good high school, and that defendant was a juvenile tried and convicted as an adult. The court further noted that there were many positives in defendant's life but stressed that "but for that gun jamming, this would have been a different kind of trial, it would have been even more serious than it is now and it was extremely serious when we went through the trial."

¶ 23 Defendant filed a motion to reconsider his sentence. Defendant argued that his sentence was excessive in light of his youth, family status, and lack of an adult criminal background. Defendant further argued that the circuit court failed to properly weigh mitigating factors and placed excessive weight on the aggravating factor that defendant's actions caused or threatened serious harm to others. At argument on the motion, defense counsel argued that although defendant was tried as an adult, he is a juvenile. Defense counsel argued that the defendant's sentence of 19 years more than the minimum did not account for defendant's youth or family support. Accordingly, defense counsel asked for a sentence of 31 years' imprisonment, *i.e.*, 6 years' imprisonment for attempted first degree murder plus the mandatory 25-year enhancement for personally discharging the firearm that caused great bodily harm. Defense counsel also took issue with the circuit court's findings at the sentencing hearing that the event may have been more serious had defendant's gun not jammed. According to defense counsel, the circuit court should not have taken that into account in crafting a sentence. Defense counsel argued that evidence showed that defendant did not aim the gun at anyone else on the bus and that the possibility of other bad things resulting from defendant's actions was speculative. In response, the State pointed out that the circuit court properly considered all matters in aggravation and mitigation. The State noted that defendant had already been adjudicated delinquent for a residential burglary. The State further argued that the evidence of the gun jamming is relevant

because had the gun not jammed, defendant would have been guilty of murder, not attempted murder. In reply, defense counsel argued defendant should be sentenced on what actually occurred, not on what could have happened.

¶ 24 The circuit court, in announcing its decision, stated that the evidence showed that defendant was firing shots while running down the aisle of the bus, which placed the other passengers on the bus at risk of harm. The circuit court further noted that defendant also tried to fire additional shots at the victim, but was unable to because of the gun jamming.

¶ 25 The circuit court denied defendant's motion to reconsider his sentence, and defendant timely appealed.

¶ 26                                    ANALYSIS

¶ 27 Defendant raises the following issues for our review: (1) whether the State presented sufficient evidence to support the sentencing enhancement (720 ILCS 5/8-4(c)(1)(D) (West 2010)) he received based on the jury's finding that he personally discharged a firearm that caused great bodily harm; (2) whether the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2010)) is constitutionally valid; (3) alternatively, whether his sentence is excessive in light of his age, family support, education, and lack of a violent criminal background; and (4) whether his mittimus needs to be corrected.

¶ 28                          Sentencing Enhancement

¶ 29 Defendant first asks this court to reverse his conviction, under count IV of his indictment, for attempted first degree murder predicated on the personal discharge of a firearm that proximately caused great bodily harm. He does not dispute that the State proved that he shot Ian Roy. Rather, he argues that the State failed to prove that Roy suffered great bodily harm to support the 25-year sentence enhancement he received based on the jury's finding that he

- 11 -

personally discharged a firearm that caused great bodily harm to the victim. See 720 ILCS 5/8-4(c)(1)(D) (West 2010). Accordingly, he asks that his conviction under count IV be reversed and that we remand the matter for resentencing on one of the remaining merged counts. The State responds that the evidence proved beyond a reasonable doubt that defendant committed attempted first degree murder and that during the commission of the offense he personally discharged a firearm that proximately caused great bodily harm to Roy.

¶ 30 The due process clause of the fourteenth amendment to the United States Constitution ensures that an accused defendant is not convicted of a crime "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *People v. Carpenter*, 228 Ill. 2d 250, 264 (2008). It is not, however, the function of this court to retry a defendant when reviewing whether the evidence at trial was sufficient to sustain a conviction. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Rather, our review is focused on "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *People v. Baskerville*, 2012 IL 111056, ¶ 31. This standard applies to both circumstantial and direct evidence. *People v. Ehlert*, 211 Ill. 2d 192, 202 (2004).

¶ 31 The trier of fact is responsible for determining a witness's credibility and the weight to be given to a witness's testimony, as well as drawing any reasonable inferences from the evidence. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989). Although all reasonable inferences in the record must be given in the prosecution's favor, unreasonable inferences will not be allowed. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). The trier of fact, however, is in the best position to resolve any conflicting inferences produced by the evidence. *People v. McDonald*, 168 Ill. 2d

420, 447 (1995). The findings of the trier of fact are given great weight because it saw and heard the witnesses. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). As such, "a reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *People v. Brown*, 2013 IL 114196, ¶ 48. Although the trier of fact is accorded great deference, its decision is not binding or conclusive. *Wheeler*, 226 Ill. 2d at 115. As such, a conviction will be reversed where the evidence is so unsatisfactory, unreasonable, or improbable that it raises a reasonable doubt as to defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 32 We note that defendant urges this court to apply a *de novo* standard of review in this matter because he characterizes the issue as the application of undisputed facts to the statutory elements of the crime charged. We disagree with defendant because the issue "of whether the victim's injuries rise to the level of great bodily harm is a question for the trier of fact." *People v. Figures*, 216 Ill. App. 3d 398, 401 (1991). Accordingly, "as long as the evidence was sufficient to support a finding of great bodily harm, the trial court's determination will be affirmed." *People v. Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 14.

¶ 33 An enhancement of 25-years-to-life is added to any sentence for a conviction for attempted first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm to the victim. 720 ILCS 5/8-4(c)(1)(D) (West 2010). This court has stated repeatedly that the term great bodily harm "is not susceptible of a precise legal definition." *Figures*, 216 Ill. App. 3d at 401; see also *Lopez-Bonilla*, 2011 IL App (2d) 100688, ¶ 13; *People v. Doran*, 256 Ill. App. 3d 131, 136 (1993). This court has, however, held that it does require an injury that is more serious than an ordinary battery, which has been defined as " 'some sort of physical pain or damage to the body, like lacerations, bruises or

abrasions, whether temporary or permanent.' " *Figures*, 216 Ill. App. 3d at 401 (quoting *People v. Mays*, 91 Ill. 2d 251, 256 (1982)). "In determining whether an injury constitutes great bodily harm, the relevant question for the trier of fact to answer is not what the victim did or did not do to treat the injury but what injuries the victim in fact received." *People v. Edwards*, 304 Ill. App. 3d 250, 254 (1999).

¶ 34    After viewing the evidence in the light most favorable to the State, we hold that a rational trier of fact could find that defendant personally discharged a firearm that proximately caused great bodily harm to the victim, Ian Roy. Roy testified that defendant shot him twice. Roy stated that the bullet that hit his ankle "went in and came out." The second bullet, however, remained lodged in his right thigh at the time of trial, over a year and a half later.[1] The State asked Roy, "And to this day have there been any complications or discomfort or pain associated with that bullet that's lodged in your right thigh?," to which Roy answered "Yes sir. I feel like I lose feeling every now and then. It will go numb for no reason." Juan Arevalo, a witness and passenger on the bus, testified that the victim was in front of him "screaming in pain." Officer John Heneghan, the evidence technician who processed the scene, found "low impact blood splatter inside the bus." It is the responsibility of the trier of fact to draw reasonable inferences from the evidence and upon review all reasonable inferences in the record must be given in the State's favor. *Jimerson*, 127 Ill. 2d at 43; *Cunningham*, 212 Ill. 2d at 280. Based on Roy's testimony that defendant shot him twice, with one of those bullets still lodged in his thigh and causing his leg to go numb and lose feeling, combined with Arevalo's testimony

---

[1] Defendant shot Roy on July 16, 2010. Roy testified at defendant's trial on March 27, 2012.

that Roy was "screaming in pain" and evidence of blood found in the bus, we hold there was ample evidence to support the jury finding defendant caused Roy great bodily harm.

¶ 35                          Mandatory Transfer Provision

¶ 36    Defendant next argues that the mandatory transfer provision of the Juvenile Court Act of 1987 (705 ILCS 405/5-130(1)(a)(ii) (West 2010)) is constitutionally invalid.   Defendant alleges the mandatory transfer provision is invalid because it violates the eighth amendment (U.S. Const., amends. VIII, XIV); the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11); and the due process clauses of the federal and Illinois constitutions (U.S. Const., amends. V, XIV; Ill. Const. 1970, art. I, § 2).   Alternatively, defendant suggests that at a minimum, the mandatory transfer provision combined with the applicable sentencing provisions are unconstitutional as applied to nonhomicide offenders.

¶ 37    After briefing concluded in this matter, our supreme court issued its decision in *People v. Patterson*, 2014 IL 115102, ¶¶ 88-111, in which it upheld the constitutionality of the mandatory transfer provision.   In doing so, our supreme court rejected the same arguments defendant raises before this court.[2]  *Id.*   At oral argument, defense counsel admitted that *Patterson* rejected the arguments defendant raised in his briefs before this court.   In accordance with our supreme court's decision in *Patterson*, we also uphold the constitutionality of the mandatory transfer provision of the Juvenile Court Act of 1987.   *Patterson*, 2014 IL 115102, ¶¶ 88-111; 705 ILCS 405/5-130(1)(a)(ii) (West 2010).

---

[2] Our supreme court did, however, urge the General Assembly to review the mandatory transfer provision.  *Id.* ¶ 111 ("Accordingly, we strongly urge the General Assembly to review the automatic transfer provision based on the current scientific and sociological evidence indicating a need for the exercise of judicial discretion in determining the appropriate setting for the proceedings in these juvenile cases.").

¶ 38                              Sentencing

¶ 39    Defendant next argues, in the alternative, that the circuit court abused its discretion when it sentenced him to a total of 50 years' imprisonment.   According to defendant, the circuit court did not accord proper consideration to pertinent mitigating factors or the constitutionally mandated objective of restoring him to useful citizenship.   Defendant points out that he was 16 years old at the time of the offense, he will be 66 years old when he is finally released, and 69 years old when his mandatory term of supervised release is completed.[3]   Defendant argues that his sentence is inappropriate because he had a minimal criminal background, he was attending high school at the time, he had the support of his family, and the victim was not seriously injured.   Accordingly, defendant asks that his sentence be reduced or the matter be remanded for a new sentencing hearing.

¶ 40    In response, the State argues the circuit court exercised appropriate discretion in sentencing defendant to 50 years' imprisonment, a period of time within the statutory guidelines. The State argues that the circuit court considered the facts of the case, factors in aggravation and mitigation, the presentence investigation, and defendant's own testimony in mitigation.   The State argues that defendant's actions were brazen and posed a serious threat to the community and other bus passengers.   The State also points out that defendant, while awaiting trial in this matter, had been adjudicated delinquent for residential burglary.   The State maintains that the circuit court properly considered mitigating circumstances but properly crafted an appropriate sentence based on the seriousness of the offense.

---

[3]   Defendant also points out that he must serve 85% of the sentence imposed in prison. 730 ILCS 5/3-6-3(a)(2)(ii) (West 2010).

¶ 41   The Illinois Constitution requires that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The sentencing judge, however, is given great discretion in determining a sentence within the limits set by the legislature by statute. *People v. Fern*, 189 Ill. 2d 48, 53 (1999). Accordingly, a sentencing decision by the circuit court is accorded great deference and weight. *People v. Streit*, 142 Ill. 2d 13, 18-19 (1991). "The trial court is granted such deference because the trial court is generally in a better position than the reviewing court to determine the appropriate sentence. The trial judge has the opportunity to weigh such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). This determination must be based on the particular circumstances of the case. *Fern*, 189 Ill. 2d at 53. The trial court must balance the goals of retribution and rehabilitation of the defendant when determining a sentence. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). A defendant's potential for rehabilitation is not given greater weight than the seriousness of the crime. *People v. Coleman*, 166 Ill. 2d 247, 261 (1995).

¶ 42   The sentencing court's discretion, however, "is not totally unbridled." *Streit*, 142 Ill. 2d at 19. Under Supreme Court Rule 615, a court of review has the power to reduce a sentence if the sentence was unlawful or an abuse of the trial court's discretion. Ill. S. Ct. R. 615(b)(1), (b)(4); *People v. Jones*, 168 Ill. 2d 367, 378 (1995). Our supreme court has cautioned that courts of review should proceed with care and great caution when reviewing a sentencing decision. *Streit*, 142 Ill. 2d at 19. We will not substitute our judgment for that of the trial court merely because we would have weighed the appropriate factors differently. *Stacey*, 193 Ill. 2d at 209. "A sentence within statutory limits will not be deemed excessive unless it is

greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Fern*, 189 Ill. 2d at 54.

¶ 43    The sentencing range for defendant's conviction for attempted first degree murder is 6 to 30 years' imprisonment, and the circuit court sentenced him to 25 years' imprisonment.    The sentencing range for the enhancement due to the jury's finding that defendant personally discharged a firearm that proximately caused great bodily harm is 25-years-to-life, and the circuit court sentenced him to 25 years' imprisonment bringing defendant's total sentence to 50 years' imprisonment.    Therefore, the circuit court sentenced defendant within the statutory range; albeit near the maximum sentence for his attempted first degree murder conviction and at the minimum amount for the sentencing enhancement due to personally discharging a firearm that caused great bodily harm.    We affirm defendant's sentencing enhancement of 25 years' imprisonment but we find that the circuit court abused its discretion when it sentenced defendant to the top of the sentencing range for his conviction for attempted first degree murder.

¶ 44    Our review of the record shows the circuit court acknowledged the presentence investigation report, defendant's youth, family support, and education.    The court, however, also considered uncertain speculative evidence of the gun jamming to support a phantom aggravating factor that but for defendant's gun jamming, defendant would have caused more violence on the bus that day.    The only occurrence witness who testified that defendant's gun jammed was Ian Roy, the victim.    Roy, however, was uncertain that the gun jammed, testifying that "I guess his gun jammed" and that "his gun jammed or something.    He was playing with it."    Regardless of whether the gun actually jammed or not, Roy also testified that defendant "fixed it" and fired two more shots.    Accordingly, the gun jamming, if indeed it occurred, may have slightly slowed down defendant's shooting, but he still managed to fire two more shots after the alleged jamming

occurred. When considering aggravation factors and sentencing defendant at the high end of the sentencing range, the court erred in finding "but for that gun jamming, this would have been a different kind of trial, it would have been even more serious than it is now." We hold that the circuit court's finding that more violence could have occurred to be speculative and uncertain in light of Ray's uncertain testimony and the evidence that defendant managed to fire two more shots after the gun allegedly jammed. This is not a situation where a shooting stopped due to a malfunctioning gun. Rather, based on Roy's testimony, if the gun jamming did occur the defendant was still able to fire two additional shots that either hit Roy or no one. The result, contrary to the court's finding in aggravation, was not any more serious than what actually occurred. We acknowledge that Elizabeth Haley, the expert in firearm's identification, noted "that the slide of the firearm did not move smoothly on a consistent basis," which she opined could cause the gun to jam. We also acknowledge that Officer John Heneghan, the Chicago police evidence technician who recovered the firearm, observed that the gun did not function properly due to "stove piping," Neither Haley's nor Officer Heneghan's testimony, however, discredits Roy's observation that defendant managed to fix any alleged jamming before firing two additional shots. The additional shots fired lead us to conclude that the circuit court's reliance on the idea that more damage would have occurred but for the gun jamming was error and a factor in the court's sentencing the defendant at the high end of the sentencing range for attempted first degree murder.

¶ 45 We are also of the opinion that defendant's sentence, which will not be completed until defendant, a minor, is 66 years old, is excessive and does not account for the constitutional requirement that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970,

art. I, § 11.  We acknowledge that the circuit court noted that it considered the presentence investigation report, defendant's youth, family support, and education.  Defendant's sentence, however, does not satisfy the constitutional objective of restoring defendant to useful citizenship. Factors that weigh in favor of defendant's rehabilitative potential include his age, family support, and the fact that defendant was in high school and his criminal record consisted only of a recent adjudication of delinquency for residential burglary.

¶ 46    In *Roper v. Simmons*, the Supreme Court banned the death penalty for juveniles and noted that children do not have fully matured levels of judgment or impulse control, and they are uniquely capable of change.  *Roper v. Simmons*, 543 U.S. 551, 568-75 (2005).  More recent decisions have continued to recognize the "diminished culpability and heightened capacity for change" of juvenile offenders.  *Miller v. Alabama*, 567 U.S. ___, ___, 132 S. Ct. 2455, 2469 (2012); see also *Patterson*, 2014 IL 115102, ¶ 111 (rejected constitutional challenge to mandatory transfer provision of Juvenile Court Act of 1987, but noted that "modern research has recognized the effect that the unique qualities and characteristics of youth may have on juveniles' judgment and actions").  A juvenile's lack of matured judgment has long been acknowledged in our society and well-evidenced by voting age requirements, driving age restrictions, and the restriction of alcohol consumption by age.  Neuroscience research suggests that the human brain's ability to govern risk and reward is not fully developed until the age of 25.  Dana Goldstein, *Too Old To Commit Crime?*, N.Y. Times, Mar. 22, 2015, at 4SR.[4]  Social science research has shown that most criminals, including violent ones, mature out of lawbreaking before

---

[4] A similar version of this article can be found at NYTIMES.com.  Dana Goldstein, *Too Old to Commit Crime?* N.Y. Times, Mar. 20, 2015, http://nytimes.com/2015/03/22/sunday-review/too-old-to-commit-crime.html?_r=0.

reaching middle age. *Id.* One criminologist and his colleagues[5], in studying arrests for murder, rape, robbery, aggravated assault, burglary, larceny-theft, and car theft, found that the typical career length of adult criminals who commit such crimes is only 5 to 10 years. *Id.* Despite this abundance of authority supporting lessened sentences for juvenile offenders, defendant's sentence in this matter would not end until he is 66 years old. We hold this lengthy sentence does not take into account defendant's youth or the constitutional objective of restoring him to useful citizenship.

¶ 47    Accordingly, we affirm the circuit court's minimal sentencing decision regarding defendant's sentencing enhancement of 25 years' imprisonment. The circuit court, however, abused its discretion in sentencing defendant to 25 years' imprisonment for attempted first degree murder because it relied on the speculative evidence of defendant's gun jamming and because defendant's sentence did not satisfy the constitutional objective of restoring him to useful citizenship. Under the authority of Supreme Court Rule 615(b)(4) (Ill. S. Ct. R. 615(b)(4), we reduce defendant's sentence for attempted first degree murder to six years' imprisonment. Therefore, defendant's total sentence is 6 years' imprisonment for his conviction for attempted first degree murder plus the 25-year sentencing enhancement for a total of 31 years' imprisonment.

¶ 48                                    Mittimus

¶ 49    Defendant's final claim of error is that his mittimus needs to be corrected to reflect only one conviction for attempted first degree murder because his sentencing order improperly lists his convictions for counts I through III even though those counts merged into count IV. He asks that his mittimus be corrected to reflect a single conviction for attempted first degree murder under count IV to conform to the circuit court's oral pronouncement that counts I through

---

[5] Alfred Blumstein of Carnegie Mellon.

III merged into count IV. The State responds that the mittimus properly reflects the circuit court's order because it states "Counts 1 through 3 merge into count 4" but notes that "if this court finds that the mittimus should only reflect count 4, then the mittimus should be corrected accordingly."

¶ 50    Initially, we note that we have the authority to order the correction of the mittimus without remanding. *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 46; Ill. S. Ct. R. 615(b)(1). Our review of the sentencing order shows that it lists sentences of "0 years and 0 months" for counts I through III despite later stating in the order that counts I through III merged into count IV. The circuit court clearly pronounced that counts I through III merged into count IV. Accordingly, for the sake of clarity, we direct the circuit clerk to issue a mittimus that clearly reflects that defendant was only sentenced on count IV of the indictment.

¶ 51                                         CONCLUSION

¶ 52    The judgment of the circuit court of Cook County is affirmed as modified and the mittimus is corrected.

¶ 53    Affirmed as modified; mittimus corrected.

THE PEOPLE OF THE STATE OF ILLINOIS,

              Plaintiff-Appellee,

      v.

ZACHARY BROWN,

              Defendant-Appellant.

No. 1-13-0048

Appellate Court of Illinois
First District, First Division

April 20, 2015

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Cunningham concurred in the judgment and opinion.

Appeal from the Circuit Court of Cook County.

The Honorable Arthur F. Hill, Jr., Judge Presiding.

Michael J. Pelletier, State Appellate Defender, Office of the State Appellate Defender, 203 North LaSalle Street, 24th Floor, Chicago, IL 60601, (Alan D. Goldberg and James J. Morrissey, of counsel), for APPELLANT.

Anita Alvarez, State's Attorney, County of Cook, Room 309, Richard J. Daley Center, Chicago, IL 60602, (Alan J. Spellberg, Miles J. Keleher, Douglas P. Harvath and Lisanne Pugliese, of counsel), for APPELLEE.