2020 IL App (1st) 170893-U

No. 1-17-0893

Order filed September 30, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 12967 |
| | ) | |
| DIMEYON COLE, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE REYES delivered the judgment of the court.
Justices Lampkin and Burke concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's conviction for first degree murder over his contention that his 28-year sentence is excessive.

¶ 2    Following a bench trial, defendant Dimeyon Cole was found guilty of first degree murder (720 ILCS 5/9-1 (West 2016)) and sentenced to 28 years' imprisonment. On appeal, defendant contends that his sentence was excessive. For the following reasons, we affirm.

¶ 3 Defendant was charged in connection with the 1999 murder of Darryl Green (Darryl), which occurred when defendant was 16 years old. Defendant was charged by indictment with 13 counts of first degree murder (counts 1 through 13) as well as eight counts of aggravated kidnaping (counts 14 through 21); one count of armed robbery (count 22); three counts of burglary (count 23 through 25); and one count of aggravated unlawful restraint (count 26). The State nol-prossed all charges against defendant except for the 13 murder counts. Because defendant challenges his sentence and not the sufficiency of the evidence to support his conviction, we recount the facts to the extent necessary to resolve the issue of alleged sentencing error.

¶ 4 At defendant's 2016 trial, Darwin Green (Darwin) testified that Darryl was his twin brother. As of June 1999, the brothers operated a cell phone and beeper store. On June 18, 1999, Darwin received a telephone call from someone who said "[W]e got your brother" and hung up. Darwin went to the beeper store and found that the front door was locked, which was unusual. Darwin called Darryl's girlfriend, who had a key to the store.

¶ 5 When Darwin was able to enter the store, he saw that it was messy and appeared as if someone had been rummaging through it "looking for something." He then received another phone call, in which the caller stated that "we got your brother" and asked for $200,000. Darwin spoke to the callers four or five times, and they eventually lowered the ransom demand to $100,000. Darwin testified that the callers sounded "paranoid, like they knew I had told the police." During one of the calls, the callers put Darryl on the phone. The callers eventually asked Darwin to meet at a certain point on the side of an expressway. Darwin did not go to the meeting spot but contacted law enforcement.

¶ 6     Darwin met with agents of the Federal Bureau of Investigation (FBI), and agreed to allow them to record his phone calls. About 8:00 p.m., Darwin received a final call from the kidnappers. A recording of the call, People's Exhibit 12, was played in court.

¶ 7     Tiffany Bailey testified that she was engaged to Darryl and worked with him at the beeper store. On June 18, 1999, she stopped by the store around 5:00 p.m., spoke to Darryl, and left around 5:20 p.m. Shortly thereafter, she tried to call Darryl at the store but received no answer.

¶ 8     Bailey then received a call from Darwin, who asked if she had keys to the store. She asked Darwin what was going on, and he said he would tell her later. Bailey returned to the store and discovered that the side door was unlocked, which was unusual. When she entered the store she saw that "drawers on both desks were open" and items were "disarranged." Darryl was not there but she found his wallet, which was missing his driver's license. Bailey called Darwin, who told her that Darryl had been kidnapped.

¶ 9     Stephanie Lewis testified that she was in a dating relationship with Kevin Mitchell as of June 1999. She frequently saw Mitchell with defendant, with whom he had "a father/son relationship;" defendant sometimes referred to Mitchell as "dad." Mitchell and defendant often socialized with two other men, Raymond Winters and another person nicknamed "Papoose."

¶ 10    In May 1999, Lewis purchased a 1994 Chevrolet Astro van. Although the vehicle was in her name, Mitchell drove it "every day." She often noticed defendant, Winters, and Papoose in the van.

¶ 11    Lewis listened to the recording in People's Exhibit 12 and recognized Mitchell and Winters's voices. Winters's voice was louder, and Mitchell's voice sounded like it was in the

background. During the call, Mitchell said "make arrangements for your brother" and "[w]e ain't calling back no more."

¶ 12    Menard McAfee testified for the State. At the time of defendant's trial, McAfee was serving a 50-year sentence for a murder conviction in an unrelated case. He acknowledged that he was testifying pursuant to a deal in which the State would recommend a sentence of 30 years' imprisonment for attempted murder in connection with Darryl's death, with that sentence to run concurrently with his prior murder sentence.

¶ 13    McAfee acknowledged that he was known by the nickname "Papoose." In 1999, Winters and Mitchell came to him with a proposal to rob a beeper store. On June 18, Mitchell drove a van with McAfee, defendant, and Winters to the beeper store. McAfee and Winters entered the store, restrained Darryl, and searched for money. During the robbery, defendant entered with duct tape, which the men used to bind Darryl's hands and feet. The men did not find any money in the store's cash register. McAfee searched Darryl's wallet and removed his identification. When they concluded their search for money, Mitchell told the other men to bring Darryl with them, and they placed Darryl in the back of the van. Mitchell drove to his mother's house, and the men brought Darryl to the basement of a nearby abandoned building.

¶ 14    McAfee further testified that Mitchell asked Darryl for his brother's phone number. Winters then made a number of calls to Darwin demanding money for his brother's return. At one point, Mitchell asked McAfee and Winters to go to the address listed on Darryl's license, in order to see if his family had contacted police. McAfee and Winters used defendant's car to drive toward Darryl's residence, while defendant and Mitchell stayed with Darryl in the basement. As McAfee and Winters approached Darryl's residence, they saw what they believed to be FBI vehicles. As

they drove back where Darryl was being held, they contacted Mitchell and told him that someone had "called the feds or the FBI." When they returned, Mitchell told Winters to make another call to Darwin. During that call, Mitchell told Winters what to say to Darwin. McAfee identified People's Exhibit 12 as a recording of that telephone call.

¶ 15    After the phone call, the four men placed Darryl in the van and drove towards Indiana. McAfee testified that he and defendant were in the back of the van with Darryl. At one point during the drive, McAfee struck Darryl with a "club" steering wheel lock; McAfee said he did so because he still wanted to get money from Darwin. According to McAfee, defendant also "tazed" Darryl with a stun gun.

¶ 16    Near Gary, Indiana, the men drove off the expressway and to a secluded side road. McAfee, Mitchell, and defendant exited the vehicle, while McAfee "stood in the back of the van." McAfee testified that Mitchell "put the victim on his shoulder and walked him in the woods" with defendant.  At that point, defendant was holding a gun but Mitchell was unarmed. McAfee heard gunshots but did not see who fired them. When Mitchell and defendant emerged from the woods, Mitchell was holding the gun. Mitchell gave the gun to defendant and directed him to "get rid of it." Defendant eventually gave the gun to McAfee and Winters, who threw it into the Chicago River.

¶ 17    Raymond Winters testified that he was incarcerated and serving a 25-year sentence on a prior conviction in an unrelated case. In exchange for his testimony in this case, his charge in this matter was reduced from murder to attempted murder, and he received a sentence of 10 years.

¶ 18    In April 1999, Winters purchased a cell phone under a false name. In June 1999, Winters and Mitchell discussed kidnapping someone to "hold him for ransom." Consistent with McAfee's

testimony, Winters described how the men targeted the beeper store and kidnapped Darryl. Winters used his phone to demand money from Darwin and to discuss a meeting point. Mitchell eventually asked Winters and McAfee to see if Darwin was being followed by police. As Winters and McAfee drove towards the meeting point, Winters believed he saw FBI vehicles and reported this to Mitchell. At Mitchell's direction, Winters called Darwin and told him that his brother was going to die. Winters acknowledged that People's Exhibit 12 was a recording of that call.

¶ 19    The four men then placed Darryl into the van, and Mitchell directed Winters to drive the van to Indiana. According to Winters, defendant was in the passenger seat while McAfee and Mitchell were in the back of the van, where they hit Darryl. After the van had stopped, "Kevin Mitchell told [defendant] he was going to have to kill [a] dude." The other men brought Darryl to the side of the road. Winters saw Mitchell shoot Darryl twice at close range; Winters could not see where defendant was at that time. Winters then turned his head and heard additional shots. When the men returned to the van, Winters noticed that Mitchell was holding a pistol. After the shooting, Mitchell told defendant to get rid of the gun; Winters and McAfee later threw the gun into the Chicago River.

¶ 20    Eleanor Johnson testified that she lived in Gary, Indiana in June 1999. On the evening of June 18, she was driving to a friend's house when she noticed a van behind her. She saw the van park across the street from her friend's house. She saw the van make a U-turn before stopping. Two men exited the van and pulled out an object that looked like a "rug" that Johnson thought might contain a body. After she went inside her friend's house, Johnson heard three shots. The next morning, she and her friend discovered a body "with his hands behind him cuffed."

¶ 21 An evidence technician with the Lake County Police Department in Indiana testified that Darryl's body was found in a wooded area with his hands and ankles bound with duct tape; three .380 caliber shell casings were found nearby. The parties stipulated that the pathologist who performed the autopsy found multiple gunshots to the head and opined that the manner of death was homicide.

¶ 22 FBI agent Matthew Alcoke testified that on June 18, 1999, he met with Darwin Green and obtained permission to record his incoming calls. Alcoke was present during the final call received from the kidnappers. FBI agents eventually determined the phone number that was used to call Darwin, and then investigated the call history of that phone to conduct interviews.

¶ 23 Mitchell and Winters were identified as potential suspects in 1999, but there was insufficient information to pursue charges at that time. In 2008, McAfee, who was incarcerated for another crime, expressed interest in speaking to the FBI. Agents spoke to McAfee in May 2009. Agents subsequently interviewed Winters, who was incarcerated for a separate murder. Winters eventually agreed to cooperate in this case. Mitchell and defendant were arrested in June 2013. Alcoke recalled that when defendant was interviewed, he did not admit to any involvement in the kidnapping or murder but "never clearly articulated a denial" and "peppered his responses with memory issues, an inability to remember."

¶ 24 Defendant elected not to testify, and no defense witnesses were called. Following closing argument, the court found defendant guilty on all charged counts of murder.

¶ 25 Defendant filed a number of post-trial motions, including a "Motion for Judgment of Acquittal or, in the Alternative, A New Trial or Dismissal of the Case on Jurisdictional Grounds." Defendant's post-trial motions were denied.

¶ 26    Prior to sentencing, the court ordered psychological testing of defendant. Defendant's presentence investigative report (PSI) reflected that he was 34 years old at time of sentencing. The PSI indicated that he is married and has one child, as well as three step-children. The PSI listed seven prior convictions, including a 2003 conviction for possession of a stolen motor vehicle, for which defendant was sentenced to three years' imprisonment, and a 2005 vehicular hijacking conviction, for which he was sentenced to seven years.

¶ 27    A defense mitigation report by Elena Quintana Ph. D., was also filed with the court. That report offered an extensive personal history and evaluation of defendant, based in part on psychological testing and interviews with defendant, his mother and stepfather. In the report, Dr. Quintana stated that defendant's "involvement in the offense was the product of being influenced by * * * adult co-defendants when he was a child with an undeveloped brain, in the throes of serious emotional upheaval and unmitigated familial and social distress, including exposure to abuse, neglect and household dysfunction."

¶ 28    The report noted that defendant had "severe disruption in his childhood," including the death of his father when he was only five years old. He also "los[t] his mother and stepfather to drug abuse, each serving two stints in prison before [defendant] was 16 years of age," and was exposed "to abuse, neglect and household dysfunction." When he was 14 years old, defendant was "sexually abused at the hands of a man referred to as his uncle." Defendant left home because he did not feel safe, became homeless, and dropped out of high school. At age 15, he began a relationship with a woman who later became his wife and the mother of his child. According to the report, defendant "has been an active father and husband, and has maintained a long term

relationship, albeit with interruption." Defendant helped to raise his biological child, as well as his wife's three other children.

¶ 29    The defense mitigation report stated that defendant was "remorseful and somewhat depressed." The report emphasized that his "previous incarceration resulted in a recommendation from his Parole Agent for early release to the community because of compliance and exceptional adjustment to community with steady work, desire to lead crime free life; sincerely changed his life for better." The report noted he had "worked consistently since 2007" and financially supported his child and stepchildren. Dr. Quintana opined that "if he were to live within the community he would fare well with support and connections to employment opportunities, counseling, and treatment options."

¶ 30    At the sentencing hearing, the State presented victim impact letters from Bailey and Darwin. Bailey described Darryl as a loving companion, father and brother whose loss caused "unbearable pain and anguish." She expressed her desire that defendant receive the maximum penalty. Darwin expressed ongoing pain and trauma from his brother's death. He stated that he had "nightmares reliving that moment wondering if I could have done anything," and that "[t]he phone call [from the kidnappers] telling me to make arrangements for my twin brother plays over and over in my head."

¶ 31    In aggravation, the State anticipated that defense counsel would argue that defendant's role in the killing was minimal: "And the argument will be, well, Judge, he didn't shoot him he was supposed to shoot him * * * and he didn't do it, therefore, you know, he should be given the minimum." The State remarked that: "From Darryl Green's perspective, [defendant] was there, he was helping, taking a man bound hand and foot out of a van * * * and standing there while your

partner puts three bullets in the back of that guy's head." The State asked the trial court to consider the "nature of the crime," stating that "this was a premeditated plan that this defendant was involved in, it was a premeditated plan to kidnap somebody for money." The State also pointed out that defendant had three prior felony convictions. The State argued that, notwithstanding his dysfunctional family history and young age, defendant knew that it was wrong to bind Darryl with duct tape, kidnap him, and kill him. The State argued: "Maybe it's not a 60-year case, Judge, like Kevin Mitchell got, but it's certainly not a minimum case either."

¶ 32    In mitigation, defense counsel argued that there was no premediated plan to kill Darryl, but that it was Mitchell's idea to do so. Counsel argued that defendant's involvement was minimal, noting that defendant did not make any of the ransom calls. Defense counsel also argued that McAfee and Winters' testimony from Mitchell's trial indicated that Mitchell ordered defendant to shoot Darryl but defendant refused:

> "Furthermore, the transcripts that I provided to you from Mitchell's trial show that this defendant refused to kill the victim. At Mitchell's trial, McAfee and Winters both testified that Mitchell ordered this defendant to shoot the deceased when they were in Indiana and that he refused, he chickened out, no, I'm not going to do it. So Mitchell took the gun from and shot the victim, that's what happened. The State didn't mention that."[1]

¶ 33    Referencing the sentences of the three adult codefendants, defense counsel argued that defendant was not deserving of the same level of punishment:

---

[1] The sentencing hearing transcript reflects that, during the hearing, defense counsel tendered to the court excerpts of testimony given by McAfee and Winters at Mitchell's trial. However, those excerpts are not included in the record on appeal.

"It was a hidden plan by Mitchell * * * and the Court sentenced Mitchell to 60 years, the maximum, in this case. The two adult co-defendants who worked out deals with the State, they received sentences of – Winters, ten years at 85 percent, and David McAfee got 30 years, but that was concurrent to a case that he was serving, I believe it was – I think it was a 50 year sentence, so no additional time for him. So he pled guilty, he got 30 years, and another co-defendant got ten years at 85 percent.

But now the State is asking for the maximum on the juvenile who didn't even do the actions that those people got with lesser sentences, or they're putting him in the same category as the adult who is the most culpable offender who ordered this guy to do something that he refused to do. That would not be - -- that would be a mischaracterization of justice to give him a sentence based on that."

¶ 34    Defense counsel emphasized defendant's difficult childhood, including his father's death when he was five, his mother and stepfather's imprisonment, and that he became homeless at 14. Counsel argued that Mitchell took in defendant, became a father figure to him, and "groom[ed] him to try to use him."

¶ 35    Counsel stated that defendant had demonstrated he is "capable of rehabilitation," noting that the mitigation report indicated that defendant expressed remorse. Counsel pointed out that although defendant was convicted of vehicular hijacking, his parole officer recommended early parole. Counsel urged that defendant demonstrated that he could hold a job and provide for his child and stepchildren. Defense counsel urged that "the circumstances here are unlikely to recur" because defendant was now a 34-year-old adult, and not "a 16-year-old * * * who was taken

advantage of by three adults." Counsel argued that although this was a "horrific crime," defendant's involvement was "minimal compared to the adult co-offenders." Counsel thus requested that defendant receive the minimum term of 20 years' imprisonment.

¶ 36    Defendant declined to address the court in allocution.

¶ 37    In announcing sentence, the trial court stated that it had considered the PSI, the defense mitigation report, and victim impact statements. The court explained:

> "In summary, we all agree that this was a hideous crime. The leader from my standpoint was Kevin Mitchell. In this case in reviewing the evidence, it was clear to me that [defendant] was, I don't know if the proper word is enamored, but he looked upon him as a father figure.
>
> Kevin Mitchell has a strong personality, he was before me for trial, and I can see why someone of a younger age may look upon him as some type of father figure, which he isn't * * * but that's what happened in your situation from what I have seen of the evidence in this case.
>
> On the other hand, you were involved in a situation involving a very serious crime which resulted in the kidnapping, beating, and death of a human being, and there's a certain amount of punishment that needs to be imposed for your involvement in that type of action, it can't be condoned by a civil society. But in considering what type of sentence I should impose, I'm very mindful of your family condition, I'm very mindful of the facts as they were presented regarding the influence Mr. Mitchell had over you, and I think that had a strong part in your even being involved in this particular situation.

The range of sentence that I can impose in this case is between 20 and 60 years. I believe that the sentence should be more than the minimum based upon the type of crime that was committed in this case and your involvement in it. But I do believe that based upon the considerations of age and the other factors that I have just enumerated as set forth in the statute in Miller versus Alabama, the sentence that I'm going to impose in this case is that you receive 28 years in the Illinois Department of Corrections, and that will be a 100 percent sentence."

¶ 38 The trial court specified that sentence was being imposed on count 1, and that the remaining counts merged into that count. The trial court concluded: "I believe that the sentence is appropriate because * * * it indicates the seriousness of the crime to which you were involved, but it also takes into consideration the age and your other family situations, and it would give you an opportunity once you're released to hopefully go on and lead a productive life."

¶ 39 Defendant's motion to reconsider sentence was denied.

¶ 40 On appeal, defendant's sole contention is that his 28-year sentence, eight years above the 20-year minimum, was excessive. Defendant claims that the trial court failed to give adequate weight to several mitigating factors demonstrating his rehabilitative potential, including his age, troubled childhood, remorse, and "the fact that the circumstances that led to this incident are unlikely to reoccur."

¶ 41 "The Illinois Constitution requires a trial court to impose a sentence that achieves a balance between the seriousness of the offense and the defendant's rehabilitative potential." *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. In doing so, the court must consider aggravating and mitigating factors including "the nature and circumstances of the crime, the defendant's conduct

in the commission of the crime, and the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." *Id.*

¶ 42    "A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record." *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). "[T]he reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed these factors differently." *People v. Stacey*, 193 Ill. 2d 203, 209 (2000).

¶ 43    The sentencing court's discretion " 'is not totally unbridled.' " *Brown*, 2015 IL App (1st) 130048, ¶ 42 (quoting *People v. Streit*, 142 Ill. 2d 13, 19 (1991)). However, "[a] reviewing court may only reduce a sentence under Illinois Supreme Court Rule 615 when the record shows that the trial court abused its discretion. [Citation.]" *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. "A sentence within statutory limits will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Id.*

¶ 44    The applicable sentencing range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20 (West 2016). Because it was within statutory guidelines, defendant's 28-year sentence is "presumed to be proper" and "will not be disturbed absent an affirmative showing that the sentence is at variance with the purpose and spirit of the law or is manifestly disproportionate to the nature of the offense." *Knox*, 2014 IL App (1st) 120349, ¶ 46. Defendant has not made that affirmative showing.

¶ 45    As an initial matter, we distinguish *People v. Buffer*, 2019 IL 122327, the subject of defendant's motion to cite additional authority, granted following submission of the parties' briefs. Defendant argues that *Buffer* supports the "proposition that the maximum sentence that can be imposed upon a non-incorrigible juvenile offender is 40 years." In turn, he suggests that his applicable sentencing range was 20 to 40 years, "absent a finding of incorrigibility." We disagree.

¶ 46    In *Buffer*, our supreme court clarified precedent regarding eighth amendment challenges to sentences imposed upon juvenile defendants pursuant to *Miller v. Alabama*, 567 U.S 460 (2012). Previous precedent established that "to prevail on a claim based on *Miller* and its progeny, a defendant sentenced for an offense committed while a juvenile must show that (1) the defendant was subject to a life sentence, mandatory or discretionary, natural or *de facto*, and (2) the sentencing court failed to consider youth and its attendant characteristics in imposing the sentence." *Buffer*, 2019 IL 122327, ¶ 27 (citing *People v. Holman*, 2017 IL 120655, ¶ 40; *People v. Reyes*, 2016 IL 119271, ¶ 9). In *Buffer*, our supreme court "dr[ew] a line of 40 years" as the point at which a juvenile defendant's prison term constitutes a *de facto* life sentence without parole. *Id*. ¶¶ 40-41 ("a prison sentence of 40 years or less imposed on a juvenile offender does not constitute a *de facto* life sentence in violation of the eighth amendment."). However, *Buffer* did not suggest that it altered the permissible sentencing range for murder where the defendant was a juvenile. We reject the suggestion that *Buffer* creates a maximum sentence of 40 years for a juvenile, absent a finding of "incorrigibility." In any event, we note the sentence in this case was much less than 40 years.

¶ 47    Turning to defendant's central excessiveness argument, he suggests that it was an abuse of discretion for the trial court to impose any sentence above the minimum, given the mitigating

factors. Defendant emphasizes that at that time of Darryl's murder, he was 16 years old and under the influence of Mitchell, "the leader, planner and shooter." Because defendant is now an adult, he argues his actions in this case were an "aberration," and that it is unlikely that he will pose a future threat to the public. He points out that he grew up without a positive adult role model and that Mitchell became his "father figure." He maintains that his involvement in the crime was a product of Mitchell's influence and "the extent of [his] participation was following Mitchell's instructions." Defendant cites *Miller v. Alabama*, 567 U.S. 460 (2012), and other precedent recognizing that juveniles are less able to make reasoned decisions, have greater rehabilitative potential, and are less deserving of severe penalties.

¶ 48    In setting forth this argument, defendant acknowledges that the trial court stated that it had considered his youth and Mitchell's influence over him. Nonetheless, he contends that the 28-year sentence "does not reflect [his] diminished culpability and greater rehabilitative potential resulting from that youth." Defendant asserts that his rehabilitative potential was evidenced by the fact that he became an "active father and husband," and had "worked consistently and excelled in his employment."

¶ 49    After reviewing the record, we find that the trial court did not abuse its discretion in sentencing defendant to 28 years' imprisonment. As acknowledged by defendant, the record makes clear that in imposing sentence the court explicitly considered the enumerated mitigating factors. Indeed, the trial court acknowledged that Mitchell was a "father figure" to defendant and that Mitchell's influence "had a strong part in [defendant] even being involved" in the crime. The trial court also remarked that it was "very mindful" of defendant's troubled family history. The trial court was also presented with a defense mitigation report which offered an extensive evaluation of

defendant, including his difficult upbringing. See *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19 (When mitigating evidence is before the trial court, it is presumed that the trial court considered it absent some contrary indication other than the sentence itself).

¶ 50    The trial court, however, also recounted the facts of the case and noted that defendant was involved in a "very serious crime which resulted in the kidnapping, beating, and death of a human being." The court clearly explained that, notwithstanding the mitigating factors, the "hideous" nature of Darryl's murder warranted a sentence somewhat "more than the minimum based upon the type of crime that was committed." The trial court also explained that it believed the sentence was appropriate because it reflected the seriousness of the crime, but it also took into consideration defendant's age and family situation, and gave him an opportunity to lead a productive life after being released from prison. The trial court undoubtedly had the discretion to do so. See *Alexander*, 239 Ill. 2d at 214 (a defendant's rehabilitative potential is not entitled to greater weight than the seriousness of the offense); *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 ("the court is not required to give greater weight to mitigating factors than to the seriousness of the offense, nor does the presence of mitigating factors either require a minimum sentence or preclude a maximum sentence. [Citations.]").

¶ 51    Given this record, and since defendant does not dispute that the trial court considered mitigating factors, his challenge boils down to an assertion that the trial court did not give those mitigating factors enough weight. In other words, he is essentially asking this court to reweigh the mitigating factors presented. This we cannot do. *Knox*, 2014 IL App (1st) 120349, ¶ 46 (a "reviewing court will not reweigh the factors in reviewing a defendant's sentence and may not substitute its judgment for the trial court merely because it could or would have weighed the factors

differently."). The record makes clear that the trial court exercised its discretion in determining that, notwithstanding significant mitigating factors, the seriousness of the crime warranted a sentence eight years above the minimum, a term on the lower end of the 20-to-60-year sentencing range. We do not find that the 28-year sentence was "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Alexander*, 239 Ill. 2d at 212. Accordingly, the sentence did not constitute an abuse of discretion.

¶ 52     In his reply brief, defendant suggests we rely on *Brown*, 2015 IL App (1st) 130048, in which our court reduced the sentence imposed upon a juvenile offender, notwithstanding that the sentencing court had acknowledged various mitigating factors. See *id.* ¶ 47 (reducing sentence for attempted first degree murder from 25 years to 6 years "because it relied on the speculative evidence of defendant's gun jamming and because defendant's sentence did not satisfy the constitutional objective of restoring him to useful citizenship" where defendant was also subject to 25-year sentencing enhancement, resulting in total sentence of 31 years' imprisonment).

¶ 53     Defendant appears to suggest that, since the juvenile offender in *Brown* received 31 years for a crime that required a specific intent to kill, defendant should receive far less, given his "minimal" participation in Darryl's murder and other mitigating factors. We find defendant's reliance on *Brown* is unavailing. First, to the extent that defendant relies on *Brown* to make a comparative sentencing argument, we decline his request as our supreme court has rejected an approach that compares sentences between defendants in unrelated cases. *People v. Fern*, 189 Ill. 2d 48, 56 (1999) ("The fact that a lesser sentence was imposed in another case has no bearing on whether the sentence in the case at hand is excessive *on the facts of that case*." (Emphasis in original)).

¶ 54    Further, there are important distinctions in *Brown* not applicable to the record in this case. Notably, the primary reason for reducing the defendant's sentence in *Brown* was that the trial court improperly "considered uncertain speculative evidence * * * to support a phantom aggravating factor that but for defendant's gun jamming, defendant would have caused more violence" during the shooting.  *Brown*, 2015 IL App (1st) 130048, ¶ 44.  There is no suggestion that the trial court relied on any speculative evidence in sentencing defendant in this case. Further, the *Brown* defendant was initially sentenced to an aggregate term of 50 years (25 years for attempted first degree murder plus a 25-year firearm enhancement), substantially more severe than the 28-year sentence imposed in this case. *Id.* ¶ 43.  Finally, in determining that the *Brown* defendant's sentence did not reflect his rehabilitative potential, our court noted that his criminal record "consisted only of a recent adjudication of delinquency for residential burglary." *Id.* ¶ 45. In contrast, defendant's PSI in this case reflected seven prior convictions, including a vehicular hijacking for which he was sentenced to seven years' imprisonment. The trial court could reasonably conclude that defendant's criminal history weighed against his rehabilitative potential.

¶ 55    In sum, we adhere to longstanding precedent and defer to the trial court's weighing of the relevant sentencing factors. See *Fern*, 189 Ill. 2d at 53 ("A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider factors than the reviewing court, which must rely on the 'cold' record."); *People v. Streit*, 142 Ill. 2d 13, 18-19 (1991) (sentencing decisions "are entitled to great deference and weight" because a trial judge "is in a far better position than an appellate court to fashion an appropriate sentence" based on its "firsthand consideration" of relevant factors including social environment and age). The record makes clear

that the court considered appropriate aggravating and mitigating factors. We decline defendant's invitation to reweigh the factors to substitute our judgment for that of the trial court.

¶ 56    For the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 57    Affirmed.