# Illinois Official Reports

## Appellate Court

*People v. Patterson*, 2018 IL App (1st) 101573-C

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD PATTERSON, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-10-1573 |
| Filed | May 22, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-1455; the Hon. Ellen Mandeltort, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier, Patricia Mysza, and Christopher Kopacz, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Noah Montague, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE NEVILLE delivered the judgment of the court, with opinion.<br>Justices Pierce and Griffin concurred in the judgment and opinion. |

**OPINION**

¶ 1    A jury found Ronald Patterson guilty of aggravated criminal sexual assault, an offense committed when he was 15 years old. The trial court sentenced Ronald, under statutes for the sentencing of adult offenders, to 36 years in prison. Our supreme court has affirmed the conviction and remanded the case to this court for consideration of sentencing issues. We hold that the trial court did not abuse its discretion when it sentenced Ronald, a 15-year-old bipolar child, to 36 years in prison, a sentence near the middle of the statutory range, for aggravated criminal sexual assault.

¶ 2                                    BACKGROUND

¶ 3    In 2008, E.C. worked for Streamwood Behavioral Health Systems (SBHS). On December 14, 2008, after 5 p.m., E.C. drove an SBHS van to Hinsdale to pick up Ronald at the end of Ronald's visit with his family. E.C. and Ronald returned to the SBHS facility, where Ronald lived, around 6:30 p.m. Once Ronald returned to his living unit, with the doors locked, E.C. told a coworker that Ronald had raped her. E.C. and her coworker called police, who came to SBHS and talked to E.C. An ambulance took E.C. to a hospital where a doctor examined her and photographed her bruises and some areas of scraped skin.

¶ 4    Police arrested Ronald at the SBHS facility that evening. A grand jury charged Ronald with three counts of aggravated criminal sexual assault. The Juvenile Court Act of 1987 required the transfer of the case to criminal court for the trial of Ronald as an adult. 705 ILCS 405/5-130(1) (West 2008).

¶ 5    At trial, E.C. testified that while she was driving Ronald from Hinsdale to the SBHS facility, he grabbed her arm and told her to exit from the highway. Because he weighed much more than twice E.C.'s weight, E.C. decided to take the exit. Ronald directed E.C. to a parking lot near some empty buildings. She opened the van's door and tried to run, but Ronald grabbed her coat. Ronald pushed E.C. against the van's side door, pinning her against the van.

¶ 6    E.C. testified that Ronald slid the door open and pushed E.C. into the van. When she tried to scramble to the door on the other side of the van, Ronald grabbed her feet and pulled her back, saying "Don't make me hurt you." He ripped off her jeans, and then he pulled down his pants and choked her to get her to open her mouth. He put his penis in her mouth for perhaps 30 seconds. He pushed her legs apart and put his tongue in her vagina. He then shoved his penis into her vagina for 30 seconds. When he pulled out, without ejaculating, he laid on top of E.C., hugged her, and told her he loved her.

¶ 7    The doctor who examined E.C. on December 14 testified that he found several bruises on E.C.'s arms and hip.

¶ 8    Ronald testified that E.C. pulled off the highway of her own accord, pulled down Ronald's pants, and performed oral sex briefly. They did not have vaginal intercourse, and he never performed oral sex on her.

¶ 9    The jury found Ronald guilty on all three counts of aggravated criminal sexual assault. The court denied his motion for a new trial.

¶ 10    The trial court granted Ronald's motion to have a social investigation performed by the juvenile probation department rather than a presentence investigation performed by the adult probation department. (In prior appeals, the parties and this court referred to the social

investigation as a presentence investigation.) The social investigator, writing in 2010, when Ronald was 16, reported that Ronald tested positive for cocaine at birth. A relative of Ronald's mother adopted him at 18 months of age, and he grew up with his adoptive parents until they found they could not protect his siblings from his increasingly violent behavior. He had extensive psychiatric treatment from the time he turned 11. The Department of Children and Family Services took custody of Ronald, at his adoptive parents' request, in 2006, when he was 13. He took Thorazine, Benadryl, Prozac, Trileptal, and Abilify, amongst other medications, to try to control his aggressive behavior and his moods. An IQ test in 2006 resulted in a full-scale score of 72.

¶ 11      School records and records from SBHS showed that Ronald acted somewhat violently on several occasions. He threw hot water on a teacher in 2004, tried to bite SBHS staff members when they restrained him in 2006, threatened to stab a staff member in 2006, and stabbed a staff member with a pencil in 2008. The behaviors led to some loss of privileges at SBHS and other discipline. Records also showed that at times SBHS rewarded Ronald for extended periods of good behavior.

¶ 12      The social investigator said in her report that Ronald had no prior police contacts. According to a printout from the police department, Ronald had one prior arrest, for throwing hot water on a teacher when he was 11, and the arrest resulted in a station adjustment.

¶ 13      A neuropsychological evaluation of Ronald, performed in 2006, found that Ronald "presented with minimal frustration tolerance ***. *** [H]e is easily distressed and defensive when talking about his history. He feels guilty over his action, yet has little sense of triggers, precipitants, coping skills or insight into behavior or emotions." Doctors diagnosed Ronald's condition as "Bipolar disorder, mixed, severe [and] Attention Deficit Hyperactivity Disorder." The social investigator reported that an evaluation performed in May 2008 concluded

> "Ronald's cognitive style is a major influence in his current social and emotional functioning. His ability to think logically and clearly becomes significantly compromised when Ronald is experiencing intense emotions. His cognitive factors are particularly problematic given he lacks a consistent and clear style of coping. His coping skills are inconsistent and unpredictable. When faced with affective-laden situations or by his own feelings, Ronald is unable to efficiently process his feelings."

¶ 14      After the offense, Dr. Roin Inaba, a psychologist working for the Juvenile Temporary Detention Center, started treating Ronald. Dr. Inaba "report[ed] Ronald has experienced tremendous growth over the past year and his willingness to acknowledge and cope with his emotions has drastically improved. Ronald has had many experiences with rejection by adults and finds it hard to trust." According to Dr. Inaba, "Ronald is a caring and sensitive person. He has a generous heart and will help others," but he "continues to struggle with depression."

¶ 15      The social investigator summarized:

> "It is apparent that Ronald Patterson has a long history of mental illness and is in need of continuous psychiatric treatment.
>
> *** [I]f it is the court's decision to sentence this defendant to the Illinois Department of Corrections it is my hope that he will be sentenced to the Illinois Department of Juvenile Justice. IDJJ offers specialized treatment of adolescents with sexually aggressive behavior problems at Kewanee-IYC. Kewanee-IYC is designated

as a specialized treatment facility, focused on the treatment of youth with sexual offending behavior, mental health issues, and substance abuse."

¶ 16 A social worker who worked with Ronald over an extended period of time wrote to the court:

"Ronald is a young man who is intelligent, kind and has a great sense of humor. There were times when Ronald was able to maintain his positive behavior over extended periods of time with the proper motivation.

On the other hand, *** he has been disruptive, disrespectful and difficult to deal with at times. Why such different opinions of Ronald; because he is a typical teenager. Now combine that with the fact that he has experienced a great deal of pain and loss in his early childhood, with limited parental guidance during his adolescence, and *** this is a formula for disaster. ***

Nevertheless, Ronald is a young man with considerable potential for growth and development. It is my hope that the court will take that into consideration and that he will be given every opportunity to become a better person and contribute positively to society."

¶ 17 A child welfare specialist who worked with Ronald wrote:

"I've known Ronald since December 2006. Since that time, I've seen positive changes in this youngster. *** Ronald appears much older than his actual age. Truly Ronald is a much younger child mentally that needs consistent psychiatric services. He tries to present himself as being normal but he mentally is a child. Ronald is like a child, always seeking acceptance and loving care. ***

I beg the court to have mercy on this youngster. He definitely continues to need clinical services as long as possible so he can continue to develo[p] into a productive adult. *** Developmentally and cognitively, Ronald is a child with consistent clinical needs."

¶ 18 At the sentencing hearing, E.C. testified:

"Ronald left me with bruises and abrasions [and] lifelong emotional injuries. No words can explain the horror and terror I experienced that evening. No amount of therapy, medication, or material items in the world can transform me into the person I was prior to being raped.

*** [O]ne month following the rape *** I fell to the floor in the kitchen, crying and confused. I had just thrown up, and the nausea wouldn't go away. *** The suffering doesn't stop.

***

*** Let the punishment match the offense."

¶ 19 The trial court sentenced Ronald to 12 years in prison on each count, with the sentences to run consecutively, for a total sentence of 36 years. Ronald must serve at least 85% of his sentence, for a total of 30 years, 7 months. See *People v. Patterson*, 2014 IL 115102, ¶ 108.

¶ 20 In a prior appeal, the appellate court remanded the case to the juvenile court for a hearing on whether to transfer the case to criminal court for sentencing. *People v. Patterson*, 2016 IL App (1st) 101573-B, ¶ 32. The Illinois Supreme Court vacated the judgment and directed this court to reconsider the case in light of *People v. Hunter*, 2017 IL 121306.

¶ 22     The decision in *Hunter* clarifies that this court cannot remand this case to the juvenile court. "A discretionary transfer hearing in the juvenile court is no longer feasible because the juvenile court may not exercise jurisdiction over" Ronald because he is now 24 years old. *Hunter*, 2017 IL 121306, ¶ 38. We address the only remaining issue in the case: did the trial court abuse its discretion when it sentenced Ronald to 36 years in prison?

¶ 23     Our supreme court, in *People v. Fern*, 189 Ill. 2d 48, 53-56 (1999), set out the applicable principles:

> "Although the legislature has prescribed the permissible ranges of sentences, great discretion still resides in the trial judge in each case to fashion an appropriate sentence within the statutory limits. [Citations.] The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.] A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record. [Citations.]
>
> In considering the propriety of a sentence, the reviewing court must proceed with great caution and must not substitute its judgment for that of the trial court merely because it would have weighed the factors differently. ***
>
> *  *  *
>
> *** The sentencing judge is to consider 'all matters reflecting upon the defendant's personality, propensities, purposes, tendencies, and indeed every aspect of his life relevant to the sentencing proceeding.' *People v. Barrow*, 133 Ill. 2d 226, 281 (1989). In reviewing a claim that a sentence within statutory limits is excessive, the court must consider whether, given the particular facts of the case, the sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense."

¶ 24     The sentencing court's discretion "is not totally unbridled." *People v. Streit*, 142 Ill. 2d 13, 19 (1991). The trial court and this court must comply with the constitutional requirement that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Thus, "[t]he trial court must balance the goals of retribution and rehabilitation of the defendant when determining a sentence." *People v. Brown*, 2015 IL App (1st) 130048, ¶ 41.

¶ 25     Here, the trial judge had before her the social investigation which reported Ronald's childhood traumas and his struggles with mental illness. His record at various institutions showed several instances of violent conduct and substantial periods of good conduct and progress. The record includes recommendations from a social worker and a child welfare specialist who asked the court to impose a lenient sentence. Ronald's psychologist noted improvement in Ronald's behavior. We cannot say that the judge ignored this evidence.

¶ 26     A number of cases decided after the court sentenced Ronald have emphasized the special concerns for sentencing juveniles because of their "diminished culpability and heightened capacity for change." *Miller v. Alabama*, 567 U.S. 460, 479 (2012). "Neuroscience research suggests that the human brain's ability to govern risk and reward is not fully developed until

the age of 25. [Citation.] Social science research has shown that most criminals, including violent ones, mature out of lawbreaking before reaching middle age." *Brown*, 2015 IL App (1st) 130048, ¶ 46.

¶ 27 The reasoning of *People v. Gipson*, 2015 IL App (1st) 122451, applies here. The *Gipson* court said:

"To be sure, this was a serious offense. *** [The victim's] injuries were severe. *** [T]he record does not indicate that the incident was planned long before it occurred; rather, it appears to have resulted from rash decision making. The record also shows that as a juvenile with mental illness, defendant was prone to impulsive behavior. ***

*** [D]efendant's impaired ability to process information may have affected his judgment. These factors diminish both defendant's culpability and the need for retribution. Furthermore, the record suggests that defendant's mental health has improved in the more recent past, at least to some degree. Thus, defendant may yet be rehabilitated and restored to useful citizenship." *Gipson*, 2015 IL App (1st) 122451, ¶¶ 73-74.

¶ 28 The trial court here apparently gave little weight to the opinions of the professionals who worked most closely with Ronald. We must defer to the trial court's weighing of the evidence concerning the sentencing factors. See *Fern*, 189 Ill. 2d at 53-56. The law in effect at the time of sentencing mandated prosecution of Ronald in criminal court, despite his age, and it mandated adult sentencing. The trial court imposed a sentence near the middle of the statutory range. We cannot say that the trial court abused its discretion in sentencing Ronald.

¶ 29 Ronald, like Gipson, should have an opportunity to show that he has worked to rehabilitate himself and control his violent impulses with sufficient time to make his life one of useful citizenship. Other states have enacted legislation giving almost all juvenile offenders the opportunity to petition for parole. The California Penal Code provides,

"When a defendant who was under 18 years of age at the time of the commission of the offense for which the defendant was sentenced to imprisonment for life without the possibility of parole has been incarcerated for at least 15 years, the defendant may submit to the sentencing court a petition for recall and resentencing." Cal. Penal Code § 1170(d)(2)(A)(i) (West 2018).

Missouri statutes similarly provide that

"Any person sentenced to a term of imprisonment for life without eligibility for parole before August 28, 2016, who was under eighteen years of age at the time of the commission of the offense or offenses, may submit to the parole board a petition for a review of his or her sentence, regardless of whether the case is final for purposes of appeal, after serving twenty-five years of incarceration on the sentence of life without parole." Mo. Rev. Stat. § 558.047 (2016).

The Supreme Court of New Jersey helpfully collected other authorities in a footnote:

"See, e.g., Cal. Penal Code §§ 1170(d)(2)(A)(i) (allowing juveniles sentenced to life without parole to petition court for resentencing after 15 years), 3051(b) (2016) (providing parole eligibility for juveniles after 15, 20, or 25 years, depending on length of original sentence); Del. Code. Ann. tit. 11, § 4204A(d)(1)-(2) (2016) (providing for judicial review of sentence for juvenile offenders after 30 years for first-degree homicide and after 20 years for other offenses); Fla. Stat. § 921.1402 (2016) (providing

for judicial review of sentences for juvenile offenders of at least 15 years after 15, 20, or 25 years, depending on length of original sentence, and establishing right to counsel); Mont. Code Ann. § 46-18-222(1) (2016) (exempting juvenile offenders from sentences of life without parole and restrictions on parole eligibility); N.C. Gen. Stat. § 15A-1340.19A (2016) (providing parole eligibility after 25 years for juvenile offenders convicted of first-degree murder); Wash. Rev. Code § 9.94A.730(1) (2016) (allowing juvenile offenders to petition sentence review board for release after 20 years); W. Va. Code § 61-11-023(b) (2016) (providing parole eligibility after 15 years for juvenile offenders sentenced to more than 15 years); Wyo. Stat. Ann. § 6-10-301(c) (2016) (providing parole eligibility after 25 years for juvenile offenders sentenced to life in prison)." *State v. Zuber*, 152 A.3d 197, 215 n.4 (N.J. 2017).

¶ 30 The Illinois General Assembly should consider similar legislation to permit juveniles subjected to lengthy sentences to show rehabilitation.

¶ 31                                                    CONCLUSION

¶ 32 The trial court sentenced Ronald, a 15-year-old bipolar child, to 36 years in prison for three acts of aggravated criminal sexual assault, where the three acts occurred in the course of two or three minutes. Because the sentence falls near the middle of the statutory sentencing range, we find no abuse of discretion. Accordingly, we affirm the trial court's judgment.

¶ 33 Affirmed.