2019 IL App (1st) 153145-U

No. 1-15-3145

Order filed September 30, 2020

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 6079 |
| | ) | |
| DION MOORE, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant's sentence of two consecutive terms of 20 years' imprisonment for two counts of second-degree murder is affirmed. Trial court did not fail to accord proper weight to defendant's belief that he was acting in self-defense or his background of only non-violent offenses.

¶ 2    Following a jury trial, defendant Dion Moore was found guilty of two counts of second-degree murder (720 ILCS 5/9-2 (West 2008)) and sentenced to two consecutive terms of 20 years' imprisonment. Defendant appeals, arguing that the trial court abused its discretion by sentencing

him to the maximum term of imprisonment where the evidence presented at trial showed that he believed, albeit unreasonably, that he was acting in self-defense and his criminal background consists only of drug-related offenses. He further asserts that the trial court acted under a misapprehension of the available sentence. For the following reasons, we affirm.

¶ 3    Defendant was charged by indictment with 24 counts of first-degree murder and one count of armed habitual criminal (AHC), stemming from the shooting deaths of Rhonell Savala and Marvel Thomas. Joshua Sanders (whose appeal is not before us) was also charged with first-degree murder in relation to the shooting deaths. Defendant's and Sanders's cases were severed prior to trial. Sanders pled guilty to one count of first-degree murder and was sentenced to 37 years' imprisonment, and the other counts against him were *nolle prossed*. Defendant was convicted of two counts of second-degree murder and subsequently pled guilty to one count of AHC. Because defendant does not challenge the sufficiency of the evidence to sustain his convictions, we recount the facts here only to the extent necessary to resolve the issue on appeal.

¶ 4    At trial, Kelley Pope testified that in the early evening of April 18, 2008, he was driving in a silver Volkswagen. Pope agreed to give Thomas Weathers, defendant, and Sanders a ride. As Pope drove through an alley near 76th and Essex, he almost hit Savala and Thomas, who were walking by. Pope and Weathers heard gunshots coming from the back of Pope's car. Weathers testified that Sanders shot at the victims from inside the car and defendant got out of the car and shot from near the trunk. Pope and Weathers both testified that they did not see Savala or Thomas with a gun. After the gunfire ended, defendant got back into the car, and Pope drove out of the alley. Pope pulled over and told defendant and Sanders to get out. Weathers testified that when he

asked why defendant and Sanders were shooting at Savala and Thomas, defendant responded "this our neighborhood."

¶ 5    Markus Stanford testified that while standing outside a store near Colfax and 75th Street with defendant, Sanders, and Haynes, two men he had never seen before drove by pointing a gun out of the window of their car. After that, Stanford saw defendant with a gun. Later, he heard gunshots and saw a gray Volkswagen. On December 2, 2008, Stanford was arrested on unrelated charges. Stanford told police he had information regarding a homicide from April 2008. When the State questioned him at trial about his discussion with officers regarding that information, Stanford either disclaimed or did not recall virtually all of what he had said.

¶ 6    Aiden O'Connor, former Assistant State's Attorney, testified that Stanford gave her a written statement on December 3, 2008. In the statement, Stanford explained that Haynes had tapped him on his shoulder and loudly said, "there go buddy and them that robbed us." Thereafter, two boys jumped in a car and left. Haynes said, "I am going to get my 40." Sanders and defendant said, "I am going to get mine too." The men then left Stanford.

¶ 7    Stanford went to his cousin's apartment at 75th and Kingston, where he saw defendant loading a clip into a handgun and Haynes with a gun in his pocket. Sanders "looked really mad." Stanford told defendant "he was wrong because he had nothing to do with it." Defendant replied, "mind [your] own business." About 8:00 p.m., Stanford was standing at 76th Street and Kingston when he heard gunshots being fired from Phillips. Stanford saw a gray Volkswagen that he knew belonged to Pope drive down Phillips. Stanford then ran over to Phillips where he saw the two boys he had seen earlier on Colfax lying on the ground, "shot and twitching."

¶ 8 One week later, Stanford was standing outside with a friend at 76th and Essex. Defendant drove by and pulled over. Stanford's friend asked defendant, "what happened to those boys on Phillips." Defendant responded, "we killed them clowns. That's what happens when they try to rob guys in the hood. We lit them up and laid them down."

¶ 9 Detective Patrick Ford testified that he investigated the shooting. He arrived on the scene about 8:30 p.m., finding the victims' bodies covered by white sheets. Upon examination of Savala's body, Ford recovered keys with an attached key fob that activated a car parked on South Phillips approximately 100 feet away.

¶ 10 Jayrica Campbell testified that she and defendant were dating around the time of the shooting. Three or four days after the shooting, defendant went to Campbell's home. Defendant told Campbell that the victims had robbed his friend and that he "wasn't going to let them rob him." He explained that the victims had pulled out a gun "like they wanted to rob him," so he got his gun and waited on the block for them to return. When they passed him, he "went after them."

¶ 11 The parties stipulated that, if called, Dr. Tera Jones would testify she performed autopsies on the victims. In Jones's post-mortem examination report of Thomas, she noted a gunshot wound of entrance on his left lateral back, with a lacerated gunshot wound of exit on his upper chest. In her expert opinion, Thomas died as a result of a gunshot wound to the back. In Jones's post-mortem examination report of Savala, she noted a gunshot wound of entrance on the right side of his back, with a shored gunshot wound of exit on his upper left chest. In her expert opinion, Savala died as a result of a gunshot wound to the back.

¶ 12 Jeremy Haynes testified for the defense that prior to April 18, 2008, he was walking in an alley when he was approached from behind by several persons, who held him at gunpoint. Along

with stealing money from his pocket, one of Haynes's assailants ripped a square diamond earring from his ear. Haynes did not see his assailants' faces.

¶ 13    Defendant testified that on April 18, 2008, about 12:00 p.m., he went to the Colfax store on 75th Street, where he first saw Savala and Thomas. One of the men was wearing a diamond earring. Defendant recalled that Haynes had just had a diamond earring stolen from him. Defendant's friend asked the man where he got the earring. The man responded, "why who want[s] to know," before walking away. When defendant left the store, Savala and Thomas were gone. Friends told defendant that Savala and Thomas had come back looking for him.

¶ 14    About five minutes later, Savala and Thomas drove by the store. Savala pointed a gun out of the car window and said, "ask Corky about me, I get down." Defendant interpreted this as Savala saying he shoots and robs people. Defendant ran to the Kingston building to hide. While there, he retrieved a weapon. He then saw Savala and Thomas drive slowly past the building, looking for him.

¶ 15    Defendant phoned Vernon Smith, also known as Corky, to ask what Savala's statement meant. Smith replied that he did not know Savala or Thomas. A few hours later, Smith called defendant and asked him to meet him. When defendant showed up, he saw Smith with Savala and Thomas, both of whom had guns. Defendant talked to Smith about why Savala and Thomas pulled a gun on him. Savala said "f*** 'em I'm about to get down on them, I ain't about to keep talking." Defendant interpreted this as Savala saying he was done talking about the issue and was going to "do whatever he came to do." Smith walked away to where a neighborhood police camera could not see him. Defendant believed that the men were going to start shooting. He ran to the Kingston

building and got a weapon. He then stood outside the building until he saw Savala and Thomas leave, at which time he put the gun back inside.

¶ 16    Defendant walked back to the Colfax store with Sanders. On the way there, defendant saw Savala and Thomas walk into an alley with a gun. Defendant ignored them and kept walking to let them know that they were not "on that." Defendant and Sanders decided to go to defendant's cousin's house. Before they left, another friend, "Little Black," gave defendant a gun in case he ran into Savala and Thomas.

¶ 17    On the way to his cousin's house, defendant and Sanders asked Pope, who was with Weathers, for a ride. As the group drove near the alley at 76th and Essex, Savala and Thomas walked by. Savala had a gun. After defendant heard gunshots, he got behind Pope's car and shot four times at Savala and Thomas. Defendant testified that he did not shoot first.

¶ 18    On cross-examination, defendant testified that on July 18, 2009, he was interviewed by detectives about the shooting. The interview was recorded and played for the jury. In the video, defendant stated that he and Sanders shot the victims. He recounted that on the date of the offense he knew where the victims had parked their car—a half a block to the west and a little bit to the south on Phillips.

¶ 19    Antoine Harris testified that on April 18, 2008, about 2:00 or 3:00 p.m., he was at the corner store at 75th and Colfax. While standing outside of the store with 20 or 30 other people, including defendant, a car pulled up with two men inside. The driver "stuck a gun out the window and flashed it towards everybody on the corner." About thirty minutes later, after defendant had left, the two men drove by the store again flashing a gun.

¶ 20    Stephanie Blanks testified that on April 18, 2008, she lived at 7608 South Philips. About 8:30 p.m., she heard approximately five gunshots. She looked through the window and saw two men lying face-down on the ground in front of a church. Two older men were picking items up from around their bodies. Blanks called the police. She did not know defendant.

¶ 21    In rebuttal, the State recalled Ford. Ford testified that he was one of the detectives that interviewed defendant in the video. He stated that the video accurately reflected that interview.

¶ 22    The jury found defendant guilty of two counts of second-degree murder. Defendant filed a motion for a new trial. Defendant's motion was denied, and the case proceeded to sentencing.

¶ 23    At sentencing, the trial court distributed a presentence investigation (PSI). The PSI contained defendant's convictions for possession of a controlled substance in 2002, 2003, and 2008, possession of cannabis in 2002, and two narcotics offenses in 2005. Defendant dropped out of high school in his junior year and has never held a job. He has three young children, all of whom visit him in jail. Defendant was affiliated with the Black P Stone street gang when he was between the ages of 16 and 25. While defendant's health is generally good, he does suffer from asthma, have a heart murmur, and use marijuana daily. He reflected that he respects people who get education, work, and obey the law.

¶ 24    In aggravation, the State argued that defendant "willfully and actively planned to go out and seek [his] targets" and that defendant's PSI reflects an "extensive criminal history" and little hope for rehabilitation. The State argued that defendant was eligible for a Class X sentence, which the court rejected after reviewing defendant's PSI.

¶ 25    In mitigation, defense counsel countered that the jury did not find that defendant had a "plan," but instead determined that the victims were the aggressors after they flashed their guns

multiple times. Counsel pointed out that defendant's prior convictions were all non-violent offenses and requested that the court impose a reasonable sentence.

¶ 26    The trial court sentenced defendant to two consecutive terms of 20 years' imprisonment. In announcing its decision, the court noted that a second-degree murder verdict "is mitigating in and of itself," then said, "what's an appropriate sentence for *** shooting and killing two people, who the evidence shows were running away at the time." The court considered defendant's PSI, recognizing that while his prior convictions were non-violent, they were felonies. The court stated that it did not "quarrel with the jury's verdict at all," and pointed out that defendant, a convicted felon, "shot and killed two young guys running off."

¶ 27    Defendant filed a motion to reconsider sentence, arguing that consecutive sentences were improper and that 20-year terms were excessive. The trial court denied defendant's motion, finding that "[t]he sentencing range is four to 20, or theoretically, probation, which [defendant] couldn't get because his prior convictions could not give him probation. He was class X mandated." The court explained that the sentence reflects defendant's potential for rehabilitation because he will be released when he is still young. Stating that the sentence was "within the statutory parameters," the court noted that it was "a Class X mandatory sentence in any event."

¶ 28    On appeal, defendant contends that the trial court abused its discretion in sentencing him to the maximum 20-year terms where he acted in self-defense and his background consisted of only non-violent offenses. He adds that the trial court improperly relied on the mistaken belief that he was eligible for Class X sentencing.

¶ 29    The Illinois Constitution requires that trial courts impose sentences with the objective of restoring a defendant to useful citizenship while also reflecting the seriousness of the offense. Ill.

Const. 1970, art. I, & 111; *People v. McWilliams*, 2015 IL App (1st) 130913, ¶ 27. In striking that balance, trial courts must consider both aggravating and mitigating factors. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). While a trial court is required to consider mitigating factors in making its decision, it has no obligation to recite each factor and its accorded weight. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, we presume a trial court properly considered all relevant mitigating factors presented. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19.

¶ 30    Trial courts are in a superior position to weigh the appropriate factors (*People v. Busse*, 2016 IL App (1st) 142941, ¶ 20), and thus their decisions are entitled to great deference on review (*Alexander*, 239 Ill. 2d at 212). A reviewing court will not reweigh the factors and substitute its judgment for that of the trial court. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20. Where a sentence falls within the statutory range, we presume it is proper and will not alter it unless the trial court abused its discretion. *People v. Brown*, 2015 IL App (1st) 130048, ¶ 42 (quoting *People v. Fern*, 189 Ill. 2d 48, 54 (1999)). An abuse of discretion exists where the sentence imposed is at a great variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Alexander*, 239 Ill. 2d at 213.

¶ 31    The trial court did not abuse its discretion here. Defendant was convicted of two counts of second-degree murder, a Class 1 felony with a sentencing range of four to 20 years' imprisonment. 720 ILCS 5/9-2(d); 730 ILCS 5/5-4.5-30(a) (West 2008). The court sentenced defendant to 20 years' imprisonment on each count, which is within the statutory range and thus presumptively proper. See *Brown*, 2015 IL App (1st) 130048, ¶ 42.

¶ 32    Defendant does not dispute this presumption, but rather argues that by imposing the maximum sentence, the trial court acted in great variance with the spirit and purpose of the law. Specifically, he asserts that because he was found to have been provoked by his victims, no penological interest justified imposition of the maximum sentence. He also maintains that the court overstated the aggravation in the case because his criminal history was entirely non-violent.

¶ 33    Defendant's claim that the trial court ignored evidence of provocation in this case is without merit. We presume that a sentencing court considers all relevant factors in making its decision. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38. To overcome that presumption, a defendant must make an affirmative showing that the sentencing court did not do so. *Id.* Defendant cannot make this showing, because the record shows that the court explicitly considered all the factors at issue.

¶ 34    At the sentencing hearing, the trial court discussed the mitigating effect of the jury's verdict of second-degree murder and stated that it had considered all mitigating factors. The court then weighed that mitigation against defendant's criminal history, which includes multiple felonies, and the seriousness of the offense, which was killing two men by shooting them in the back. See *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 13 (" 'criminal history alone' may 'warrant a sentence substantially above the minimum' " where the "defendant was not deterred by previous, more lenient sentences") (quoting *People v. Evangelista*, 393 Ill. App. 3d 395, 399 (2009)); *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32 ("The seriousness of the offense is one of the most important factors for the court to consider."). Only after it enumerated these factors did the court decide to impose the maximum sentence on defendant. Because the court is presumed to consider

all the factors presented in mitigation, and the record shows the court did so, defendant has failed to overcome the presumption of proper sentencing. See *Burton*, 2015 IL App (1st) 131600, ¶ 38.

¶ 35    The trial court correctly noted that defendant had already received a mitigated sentence via his conviction for second-degree, not first-degree murder. The trial court obviously felt no need to reduce the punishment further based on defendant's claims that his actions were the result of "strong provocation" or that "substantial grounds" existed to "excuse or justify" his conduct. 730 ILCS 5/5-5-3.1(a)(3), (4) (West 2008).

¶ 36    While there was some testimony that the victims had posed a threat to defendant, there was likewise evidence that the victims were unarmed and running away from defendant at the time they were shot, as well as evidence that defendant's later explanation for the shooting was *not* that he was acting out of fear for his life (reasonably or unreasonably) but rather that "this is our neighborhood" and that he "wasn't going to let [the victims] rob [defendant's friend]." We are in no position as a reviewing court to re-weigh this evidence and decide that the trial court should have struck a different balance.

¶ 37    Defendant's argument regarding statements the trial court made while denying his motion to reconsider sentence also fails. During that hearing, the court twice incorrectly referred to defendant as Class-X mandatory, which would make the statutory range of imprisonment six to 30 years instead of the actual applicable range of four to 20 years. Defendant claims these statements reveal that the court relied on the mistaken belief that he was eligible for mandatory Class-X sentencing.

¶ 38    The record as a whole does not support defendant's position. Both when it admonished defendant about seeking a jury instruction for second-degree murder and at the time of sentencing,

the trial court identified the correct sentencing range and made no mention of Class-X eligibility; indeed, at the original sentencing, the trial court expressly rejected the notion that defendant was Class-X mandatory. It was only during the motion to reconsider that the trial court misspoke and stated that defendant was Class-X mandatory. So we fail to see any misapprehension whatsoever concerning defendant's Class-X eligibility at the time the sentence was imposed.

¶ 39    To be sure, the trial court made misstatements at the hearing on the motion to reconsider. But the point of a motion to reconsider is not to hold a new sentencing hearing, but rather to apprise the court of newly discovered evidence, changes in the law, or errors in the previous application of existing law. *People v. Medina*, 221 Ill. 2d 394, 413 (2006). The trial court correctly found that it had made no such errors in its original sentence, and its misstatements regarding Class-X eligibility do not change that fact. We would add that even at the reconsideration hearing, the court correctly identified the relevant sentencing range of four to 20 years, notwithstanding those misstatements. We find no basis for a remand for new sentencing on this record.

¶ 40    For these reasons, we affirm the judgment of the circuit court of Cook County.

¶ 41    Affirmed.